# Exhibit 4

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

# FORM 10-Q

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the Quarter ended September 30, 2004
Commission file number 1-12215

Quest Diagnostics Incorporated

One Malcolm Avenue
Teterboro, NJ 07608
(201) 393-5000

Delaware
(State of Incorporation)

16-1387862
(I.R.S. Employer Identification Number)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes [X] No [ ]

As of October 26, 2004, there were 101,199,780 outstanding shares of the registrant's common stock, $.01 par value.

## PART I - FINANCIAL INFORMATION

|  |  | Page |
|---|---|---|
| Item 1. | Financial Statements | |
| | Index to consolidated financial statements filed as part of this report: | |
| | Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2004 and 2003 | 2 |
| | Consolidated Balance Sheets as of September 30, 2004 and December 31, 2003 | 3 |
| | Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2004 and 2003 | 4 |
| | Notes to Consolidated Financial Statements | 5 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | |
| | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | |
| | See Item 2. "Management's Discussion and Analysis of Financial Condition and Results of Operations" | 24 |
| Item 4. | Controls and Procedures | |
| | Controls and Procedures | 24 |

1

QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - CONTINUED
(in thousands, unless otherwise indicated)
(unaudited)

On April 30, 2004, the Company repaid the remaining $230 million of principal outstanding under its term loan due June 2007 with $100 million of borrowings under the Credit Facility and $130 million of borrowings under the Secured Receivables Credit Facility.

In conjunction with the debt refinancings, the Company recorded a $2.9 million charge to earnings in the second quarter of 2004 representing the write-off of deferred financing costs associated with the debt that was refinanced. The $2.9 million charge was included in interest expense, net within the consolidated statements of operations for the nine months ended September 30, 2004.

5. COMMITMENTS AND CONTINGENCIES

The Company has standby letters of credit issued under its $68 million letter of credit lines to ensure its performance or payment to third parties, which amounted to $55 million at September 30, 2004. The letters of credit, which are renewed annually, primarily represent collateral for current and future automobile liability and workers' compensation loss payments.

The Company has entered into several settlement agreements with various government and private payers during recent years relating to industry-wide billing and marketing practices that had been substantially discontinued by the mid-1990s. The Company is aware of certain pending lawsuits relating to billing practices filed under the qui tam provisions of the civil False Claims Act and other state and local statutes. Some of the proceedings against the Company involve claims that are substantial in amount.

On October 25, 2004, the Company and its test kit manufacturing subsidiary, Nichols Institute Diagnostics, each received a subpoena from the United States Attorney's office for the Eastern District of New York. The subpoenas seek the production of various business records, including documents related to tests cleared by the Food and Drug Administration for parathyroid hormone, or PTH, levels. The Company intends to cooperate with the government's investigation. Nichols Institute Diagnostics manufactures and markets diagnostic test kits and systems primarily for esoteric testing. These tests are sold principally to hospitals, clinical laboratories and dialysis centers. Quest Diagnostics' net revenues from sales of the PTH test kits and related PTH laboratory testing are estimated to be less than 1% of consolidated net revenues.

In addition, the Company is involved in various legal proceedings arising in the ordinary course of business. Some of the proceedings against the Company involve claims that are substantial in amount.

Although management believes that established reserves for legal matters are sufficient, it is possible that additional information (such as the indication by the government of criminal activity, additional tests being questioned or other changes in the government's or private claimants' theories of wrongdoing) may become available which may cause the final resolution of these matters to exceed established reserves by an amount which could be material to the Company's results of operations and cash flows in the period in which such claims are settled. The Company does not believe that these issues will have a material adverse effect on its overall financial position. However, the Company understands that there may be pending qui tam claims brought by former employees or other "whistle blowers", or other pending claims as to which the Company has not been provided with a copy of the complaint and accordingly cannot determine the extent of any potential liability.

As a general matter, providers of clinical laboratory testing services may be subject to lawsuits alleging negligence or other similar legal claims. These suits could involve claims for substantial damages. Any professional liability litigation could also have an adverse impact on the Company's client base and reputation. The Company maintains various liability insurance programs for claims that could result from providing or failing to provide clinical laboratory testing services, including inaccurate testing results and other exposures. The Company's insurance coverage limits its maximum exposure on individual claims; however, the Company is essentially self-insured for a significant portion of these claims. The basis for claims reserves incorporates actuarially determined losses based upon the Company's historical and projected loss experience. Management believes that present insurance coverage and reserves are sufficient to cover currently estimated exposures. Although management cannot predict the outcome of any claims made against the Company, management does not anticipate that the ultimate outcome of any such proceedings or claims will have a material adverse effect on the Company's financial position but may be material to the Company's results of operations and cash flows in the period in which such claims are resolved.

# LEFT BLANK



Morningstar® Document Research℠

# FORM 10-K

## QUEST DIAGNOSTICS INC - DGX

**Filed: March 10, 2005 (period: December 31, 2004)**

Annual report which provides a comprehensive overview of the company for the past year

have also applied to Medicaid-covered services. Many states have similar anti-"self-referral" and other laws that are not limited to Medicare and Medicaid referrals and could also affect investment and compensation arrangements with physicians. We cannot predict if some of the state laws will be interpreted contrary to our practices.

In April 2003, the OIG issued a Special Advisory Bulletin addressing what it described as "questionable contractual arrangements" in contractual joint ventures. The OIG Bulletin focused on arrangements where a healthcare provider, or Owner, expands into a related healthcare business by contracting with a healthcare provider, or Manager, that already is engaged in that line of business for the Manager to provide related healthcare items or services to the patients of the Owner in return for a share of the profits of the new line of business. While we believe that the Bulletin is directed at "sham" arrangements intended to induce referrals, we cannot predict whether the OIG might choose to investigate all contractual joint ventures, including our joint ventures with various hospitals or hospital systems.

Government Investigations and Related Claims

We are subject to extensive and frequently changing federal, state and local laws and regulations. We believe that, based on our experience with government settlements and public announcements by various government officials, the federal government continues to strengthen its position on healthcare fraud. In addition, legislative provisions relating to healthcare fraud and abuse give federal enforcement personnel substantially increased funding, powers and remedies to pursue suspected cases of fraud and abuse. Many of the regulations applicable to us, including those relating to billing and reimbursement of tests and those relating to relationships with physicians and hospitals, are vague or indefinite and have not been interpreted by the courts. They may be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that could require us to make changes in our operations, including our billing practices. If we fail to comply with applicable laws and regulations, we could suffer civil and criminal damages, including the loss of licenses or our ability to participate in Medicare, Medicaid and other federal and state healthcare programs. In addition, certain federal and state statues, including the qui tam provisions of the federal False Claim Act, allow private individuals to bring lawsuits against healthcare companies on behalf of government or private payers alleging inappropriate billing practices.

During the mid-1990s, Quest Diagnostics and SBCL settled significant government claims that primarily involved industry-wide billing and marketing practices that both companies believed to be lawful. The federal or state governments may bring additional claims based on new theories as to our practices that we believe to be in compliance with law. The federal government has substantial leverage in negotiating settlements since the amount of potential damages far exceeds the rates at which we are reimbursed, and the government has the remedy of excluding a non-compliant provider from participation in the Medicare and Medicaid programs, which represented approximately 17% of our net revenues during 2004.

There are certain pending lawsuits regarding our billing practices filed under the qui tam provisions of the federal false claims statute and other federal and state statutes. Some of the cases involve claims that are substantial in amount. We have also received subpoenas from the United States Attorney's Office for the Eastern District of New York requiring the production of various business records including documents related to parathyroid hormone testing and parathyroid hormone test kits manufactured by our subsidiary Nichols Institute Diagnostics. We are cooperating with the government's investigation.

Although management believes that established reserves for claims are sufficient, including qui tam cases, of which management is aware, it is possible that additional information may become available that may cause the final resolution of these matters to exceed established reserves by an amount which could be material to our results of operations and cash flows in the period in which such claims are settled. We do not believe that these issues will have a material adverse effect on our overall financial condition. However, we understand that there may be pending qui tam claims brought by former employees or other "whistle blowers" as to which we have not been provided with a copy of the complaint and accordingly cannot determine the extent of any potential liability.

As an integral part of our compliance program discussed below, we investigate all reported or suspected failures to comply with federal healthcare reimbursement requirements. Any non-compliance that results in Medicare or Medicaid overpayments is reported to the government and reimbursed by us. As a result of these efforts, we have periodically identified and reported overpayments. While we have reimbursed these overpayments and have taken corrective action where appropriate, we cannot assure investors that in each instance the government will necessarily accept these actions as sufficient.

Source: QUEST DIAGNOSTICS INC, 10-K, March 10, 2005                    Powered by Morningstar® Document Research℠

# LEFT BLANK

# Morningstar® Document Research<sup>SM</sup>

## FORM 10-K

### QUEST DIAGNOSTICS INC - DGX

Filed: February 28, 2006 (period: December 31, 2005)

Annual report which provides a comprehensive overview of the company for the past year

**Fraud and Abuse Regulations.** Medicare and Medicaid anti-kickback laws prohibit clinical laboratories from making payments or furnishing other benefits to influence the referral of tests billed to Medicare, Medicaid or other federal programs. As noted above, the penalties for violation of these laws may include criminal and civil fines and penalties and/or suspension or exclusion from participation in federal programs. Many of the anti-fraud statutes and regulations, including those relating to joint ventures and alliances, are vague or indefinite and have not been interpreted by the courts. We cannot predict if some of the fraud and abuse rules will be interpreted contrary to our practices.

In November 1999, the OIG issued an advisory opinion concluding that the industry practice of discounting client bills may constitute a kickback if the discounted price is below a laboratory's overall cost (including overhead) and below the amounts reimbursed by Medicare. Advisory opinions are not binding but may be indicative of the position that prosecutors may take in enforcement actions. The OIG's opinion, if enforced, could result in fines and possible exclusion and could require us to eliminate offering discounts to clients below the rates reimbursed by Medicare. The OIG subsequently issued a letter clarifying that it did not intend to imply that discounts are a per se violation of the federal anti-kickback statute, but may merit further investigation depending on the facts and circumstances presented.

In addition, since 1992, a federal anti-"self-referral" law, commonly known as the "Stark" law, prohibits, with certain exceptions, Medicare payments for laboratory tests referred by physicians who have personally, or through a family member, an investment interest in, or a compensation arrangement with, the testing laboratory. Since January 1995, these restrictions have also applied to Medicaid-covered services. Many states have similar anti-"self-referral" and other laws that are not limited to Medicare and Medicaid referrals and could also affect investment and compensation arrangements with physicians. We cannot predict if some of the state laws will be interpreted contrary to our practices.

In April 2003, the OIG issued a Special Advisory Bulletin addressing what it described as "questionable contractual arrangements" in contractual joint ventures. The OIG Bulletin focused on arrangements where a healthcare provider, or Owner, expands into a related healthcare business by contracting with a healthcare provider, or Manager, that already is engaged in that line of business for the Manager to provide related healthcare items or services to the patients of the Owner in return for a share of the profits of the new line of business. While we believe that the Bulletin is directed at "sham" arrangements intended to induce referrals, we cannot predict whether the OIG might choose to investigate all contractual joint ventures, including our joint ventures with various hospitals or hospital systems.

**Government Investigations and Related Claims**

We are subject to extensive and frequently changing federal, state and local laws and regulations. We believe that, based on our experience with government settlements and public announcements by various government officials, the federal government continues to strengthen its position on healthcare fraud. In addition, legislative provisions relating to healthcare fraud and abuse give federal enforcement personnel substantially increased funding, powers and remedies to pursue suspected cases of fraud and abuse. Many of the regulations applicable to us, including those relating to billing and reimbursement of tests and those relating to relationships with physicians and hospitals, are vague or indefinite and have not been interpreted by the courts. They may be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that could require us to make changes in our operations, including our billing practices. If we fail to comply with applicable laws and regulations, we could suffer civil and criminal damages, fines and penalties, including the loss of licenses or our ability to participate in Medicare, Medicaid and other federal and state healthcare programs and additional liabilities from third party claims. In addition, certain federal and state statues, including the qui tam provisions of the federal False Claim Act, allow private individuals to bring lawsuits against healthcare companies on behalf of government or private payers alleging inappropriate billing practices.

During the mid-1990s, Quest Diagnostics and SBCL settled significant government claims that primarily involved industry-wide billing and marketing practices that both companies believed to be lawful. The federal or state governments may bring additional claims based on new theories as to our practices that we believe to be in compliance with law. The federal government has substantial leverage in negotiating settlements since the amount of potential damages far exceeds the rates at which we are reimbursed, and the government has the remedy of excluding a non-compliant provider from participation in the Medicare and Medicaid programs, which represented approximately 18% of our net revenues during 2005.

We understand that there may be pending qui tam claims brought by former employees or other "whistle blowers" as to which we have not been provided with a copy of the complaint and accordingly cannot determine the extent of any potential liability. We are also aware of certain pending lawsuits related to billing practices filed under the qui tam provisions of the civil False Claims Act and other federal and state statutes. These lawsuits include class action and individual claims by patients arising out of the Company's billing policies. In addition, we are involved in various legal proceedings arising in the ordinary course of business. Some of the proceedings against us involve claims that are substantial in amount.

18

During the fourth quarter of 2004, Quest Diagnostics Incorporated and Nichols Institute Diagnostics (NID), our test kit manufacturing subsidiary, each received a subpoena from the United States Attorney's Office for the Eastern District of New York. Quest Diagnostics and NID have been cooperating with the United States Attorney's Office. In connection with such cooperation, we have been providing information and producing various business records of NID and Quest Diagnostics, including documents related to testing and test kits manufactured by NID. This investigation by the United States Attorney's Office could lead to civil and criminal damages, fines and penalties and additional liabilities from third party claims. In the second and third quarters of 2005, the FDA conducted an inspection of NID and issued a Form 483 listing the observations made by the FDA during the course of the inspection. NID is cooperating with the FDA and has filed its responses to the Form 483. Noncompliance with the FDA regulatory requirements or failure to take adequate and timely corrective action could lead to regulatory or enforcement action against NID and/or Quest Diagnostics, including, but not limited to, a warning letter, injunction, suspension of production and/or distribution, seizure or recall of products, fines or penalties, denial of pre-market clearance for new or changed products, recommendation against award of government contracts and criminal prosecution.

During the second quarter of 2005, we received a subpoena from the United States Attorney's Office for the District of New Jersey. The subpoena seeks the production of business and financial records regarding capitation and risk sharing arrangements with government and private payers for the years 1993 through 1999. Also, during the third quarter of 2005, we received a subpoena from the U.S. Department of Health and Human Services, Office of the Inspector General. The subpoena seeks the production of various business records including records regarding our relationship with health maintenance organizations, independent physician associations, group purchasing organizations, and preferred provider organizations from 1995 to the present. We are cooperating with the United States Attorney's Office and the Office of the Inspector General.

Although management cannot predict the outcome of such matters, management does not anticipate that the ultimate outcome of such matters will have a material adverse effect on our financial condition, but may be material to our results of operations and cash flows in the period in which the impact of such matters is determined or paid.

As an integral part of our compliance program discussed below, we investigate all reported or suspected failures to comply with federal and state healthcare reimbursement requirements. Any non-compliance that results in Medicare or Medicaid overpayments is reported to the government and reimbursed by us. As a result of these efforts, we have periodically identified and reported overpayments. While we have reimbursed these overpayments and have taken corrective action where appropriate, we cannot assure investors that in each instance the government will necessarily accept these actions as sufficient.

**Compliance Program**

Compliance with all government rules and regulations has become a significant concern throughout the clinical laboratory industry because of evolving interpretations of regulations and the emerging changes in laboratory science and healthcare technology. We established a compliance program early in 1993.

We emphasize the development of training programs intended to ensure the strict implementation and observance of all applicable laws, regulations and Company policies. Further, we conduct in-depth reviews of procedures, personnel and facilities to assure regulatory compliance throughout our operations. The Quality, Safety & Compliance Committee of the Board of Directors requires periodic reporting of compliance operations from management.

We seek to conduct our business in compliance with all statutes and regulations applicable to our operations. Many of these statutes and regulations have not been interpreted by the courts. We cannot assure investors that applicable statutes or regulations will not be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that would adversely affect us. Potential sanctions for violation of these statutes include significant damages, penalties, and fines, exclusion from participation in governmental healthcare programs and the loss of various licenses, certificates and authorization necessary to operate some or all of our business, which could have a material adverse effect on our business.

**Intellectual Property Rights**

Other companies or individuals, including our competitors, may obtain patents or other property rights that would prevent, limit or interfere with our ability to develop, perform or sell our tests or operate our business. As a result, we may be involved in intellectual property litigation and we may be found to infringe on the proprietary rights of others, which could force us to do one or more of the following:

- cease developing, performing or selling products or services that incorporate the challenged intellectual property;
- obtain and pay for licenses from the holder of the infringed intellectual property right;

19